85 So.2d 100 (1955)
Ernest GLOSTON
v.
COAL OPERATORS CASUALTY CO.
No. 4108.
Court of Appeal of Louisiana, First Circuit.
December 30, 1955.
Rehearing Denied February 3, 1956.
Writ of Certiorari Denied March 26, 1956.
Gravel, Humphries, Sheffield & Mansour, Alexandria, for appellant.
Dubuisson & Dubuisson, Opelousas, for appellee.
LOTTINGER, Judge.
This is a suit for workmen's compensation wherein the petitioner claims total and permanent disability, as well as penalties and attorney fees. The defendant is the insurer of petitioner's employer, Wesley Darby. The Lower Court awarded judgment for petitioner in the sum of $27.50 per week commencing July 8, 1952, during the period of his total disability not to exceed 400 weeks subject to a credit of $426.29 already paid, plus medical expenses up to $1,000 subject to a credit for medical expenses paid by defendant, plus 12% penalty and $1,100 as attorney fees. The defendant has appealed.
The evidence discloses that petitioner is a common laborer of approximately 38 years of age. He has never been to school and has little education, if any. He is unable to read. He alleges that on July 8, *101 1952, and prior thereto he was working for Wesley Darby as a truck driver. Mr. Darby was a contractor and at the time of the alleged accident, petitioner was hauling gravel to a site where a bridge was being constructed. Petitioner's general duty was to drive the dump truck, however, on some occasions it was necessary for him to help load the gravel into the dump truck from a railroad box-car by means of a shovel.
At the time of the alleged accident, petitioner had just hauled a load of gravel to the construction site in St. Landry Parish, and was on his return run. He heard air leaking from one of his tires, and stopped to check. His inspection showed that the right rear tire to the outside of the truck was flat. He secured a lug wrench from the truck and commenced to take the wheel off the axle. The lug wrench slipped and petitioner fell backward against a stump which was lying alongside the road. His back struck the stump at the small of his back, and he lay there motionless for an undisclosed period of time, from five to twenty minutes.
When petitioner had recuperated somewhat, he got into the truck and drove to his employer's home where he told Mr. Darby of the accident. Petitioner claims that Mr. Darby took him into town, purchased a Red Cross plaster for his back and then drove petitioner home. As a result of the accident, petitioner claims that he suffered a marked protrusion of the lumbo-sacral intervertebral disc, with severe compression of the first sacral nerve on the right. He complains of pain to his back and says that he is unable to resume work of any reasonable character.
Unfortunately the alleged accident to petitioner occurred on a lonely gravel road and there were no eye witnesses to the accident. Defendant contends that he knew nothing of any type of accident to petitioner until several days after the alleged date of the accident. The defense further attempted to show that petitioner was a malingerer, and had missed work often, and was always complaining of being sick.
Several neighbors and acquaintances of petitioner testified in behalf of an injury to petitioner. While they knew nothing of the accident itself, they testified that, at the approximate time of the accident and thereafter, petitioner began to walk with a stick and that he would bend over as though his back hurt. They testified that, prior to the time of the accident, petitioner was a hard worker.
Defendant claims that plaintiff has failed to prove the accident and has cited Malone, Louisiana Workmen's Compensation Law and Practice, 1951, Chapter 12, Section 252, pages 294, 295, as follows:
"In such cases proof by eyewitnesses is not always feasible, and the courts have been willing to rely upon the testimony of the plaintiff alone to establish the occasion on which he was injured if his story is plausible and consistent and is supported by surrounding circumstances."
They contended in this connection that plaintiff's story is not plausible and not consistent and is not supported by surrounding circumstances. To this argument we do not fully agree as we are of the opinion that his story is plausible and consistent and is supported by surrounding circumstances. The facts hereinabove stated is plaintiff's testimony. In addition to that his sister Elvira Gloston with whom he was staying at the time testified as follows:
"Q. Now when did you first know that Ernest was complaining about having hurt his back?
"A. When he came home that day with the Red Cross plaster."
We next note that the plaintiff was examined by Dr. S. J. Rozas on July 9, 1952 which was the day after the accident and plaintiff informed the Doctor of the history of the accident the same as is stated hereinabove and the Doctor diagnosed plaintiff's condition as sacroiliac sprain. We do not believe that this mentally deficient man would know enough about the compensation law to report a false story to *102 his Doctor the day after the accident and then to adhere to the same facts throughout the entire investigation of the claim, the medical treatment of the injury and the trial of the case.
The Lower Court felt that the petitioner proved the accident, as it awarded him a judgment. We do not feel that there is any error in such finding as would justify a reversal thereof. The trial Court was personally faced by all of the witnesses, and was in an excellent position to weigh the credibility of their testimony. It evidently chose to believe the testimony of petitioner and his witnesses on this score, and we certainly are unable to find any obvious error in the finding.
The medical testimony is almost as conflicting as the testimony as to the accident itself. On the first day following the accident, petitioner was examined by Dr. Rozas in Opelousas. His diagnosis was sacroiliac sprain. His treatment by Dr. Rozas lasted from July 9, 1952, through October 24, 1952. During this period of time, he received treatment by the doctor, or his staff, for an average of about every other day. On October 13th, Dr. Rozas put petitioner in the hospital at the suggestion of Dr. Gilly, so that petitioner might receive complete bed rest and so that he could receive Buck's extension, which is a device to put traction on the leg to relieve pain in the back. Petitioner remained in the hospital for a period of eight days. At the end of the hospitalization period, petitioner told Dr. Rozas that he felt much better and wanted to go back to work.
The day after leaving the hospital, petitioner attempted to help a friend dig fence-post holes when he immediately experienced severe pain in his back causing him to go back to bed.
It is interesting to note that on August 21, 1952, Dr. Rozas wrote a letter to the defendant company to the effect that petitioner was a malingerer. However, he further stated in his letter as follows:
"My suggestion, therefore, would be either an examination by a specialist or a settlement or possibly a combination of both in order to be of absolutely sure grounds and have somebody else's opinion of his general condition."
In spite of this letter, the doctor treated the patient until the end of October, and, during the month of October, put petitioner in the hospital on the recommendation of Dr. Gilly.
Dr. Gilly is an orthopedic surgeon in Lafayette, Louisiana. His testimony was introduced via deposition. He examined petitioner first on September 10th, 1952, at the request of Dr. Rozas. He found "tenderness over the spinus process of the fourth and fifth lumbar vertebra and marked muscle spasm of the right erector spinae muscle groups." He again examined petitioner on October 29, 1953, at which time the patient still complained of tenderness over the spinus process of the fourth lumbar vertebra. His opinion, at this time, was "that the patient was mostly exaggerating his complaints and that his responses to certain tests were definitely not consistent in that I felt that after a history of approximately ten months of sciatic pain the findings would be definitely localized and there would be some depression of reflexions as well as muscular atrophy which it failed to do in this instance."
Dr. Gilly testified that on his first examination of September 10th, he was definitely of the opinion that petitioner was disabled to perform his duties. As a result of this examination he reported to defendant that this plaintiff had sustained a moderately severe sprain of the lumbosacral spine which was still present and that his complaints of pain were still valid. He recommended that plaintiff be hospitalized and given traction and further reported in September 1952 that plaintiff would be disabled for at least four months. The doctor did not rule out the possibility of a disc injury, as sometimes they cannot be detected except by surgery. Dr. Gilly did find muscle spasm on his last examination. Although he believed that petitioner's complaints were exaggerated, he did feel that petitioner was experiencing pain.
*103 Petitioner was examined by Dr. Moss M. Bannerman, an orthopedic surgeon, on December 22, 1952. His letter, of January 13, 1953, to defendant company is in part as follows:
"This patient apparently sustained a rather severe contusion over his lower back at the time of the fall. He did not show any seriously disability or abnormalty on the present examination. The strength appeared to be good and his motion is satisfactory but the only persistent finding which we have is some tenderness over L-5 S-1.
"In view of the negative x-ray findings it is thought that these are incidental to his injury but do not represent any type of serious disability. It is thought that the continued use of heat, hard bed, and perhaps a slight correction of his right heel, together with postural exercises will cause a disappearance of these complaints over the next four to six weeks.
"I would suggest that he be instructed in these lines and if his progress is not satisfactory over the next month or so have him return for further examination."
The doctor did not rule out the possibility of a disc injury. He stated that sometimes the patient with such injury would be free of pain and the usual symptoms of a disc, and that on other occasions the pain and symptoms would reappear. He testified that x-rays showed some narrowing of the space between L-5 and S-1. He did not think plaintiff to be a malingerer.
Petitioner was examined by Dr. Homer D. Kirgis, a neuro-surgeon, whose examination was performed on February 21, 1953. He testified as follows:
"There was marked spasm of the lumbar and sacral perivertebral muscles, with considerable flattening of the lumbar lordotic curve. There was also a scoliosis of the lower spine, with the concavity of the scoliotic curve facing the right.
"There was severe exacerbation of his discomfort with percussion over the lumbosacral interval space, and with such percussion the pain would radiate from the lower part of the back into the posterior or lateral aspect of the right lower extremity.
"To sensory examination, there was rather marked hypoesthesia; that is, diminished sensation in the area of distribution of the first sacral nerve on the right.
"There was slight degree of weakness of the posterior and lateral leg muscles on the right, but there was no atrophy present.
"The reflexes were bilaterally equal and normal, except for the right ankle, which was moderately hypoactive.
"The straight leg raising was very severely positive on the right, and with this test there was both exacerbation of pain in the lower part of the back and in the right lower extremity.
"This test applied on the left caused exacerbation of pain in the lower part of the back and also pain in the right lower extremity.
"The flexed leg raising test caused exacerbation of the pain in the lower part of the back. This test was positive bilaterally, but was more positive on the right than on the left."
Dr. Kirgis testified that x-rays revealed a slight degree of narrowing of the lumbosacral intervertebral disc space. He stated that, at the time of his examination, petitioner was completely disabled, and that the history and findings were completely compatible with the diagnosis of herniation of the lumbo-sacral interval disc, with severe compression of the first sacral nerve on the right. Dr. Kirgis felt certainly, to avoid an extremely long period of disability, he should have the nerve decompressed by an operation.
At the request of defendant, the patient was examined by Dr. Karr, a neurological *104 surgeon, on November 23, 1953, who found no symptoms of a disc injury. He felt that petitioner showed no disability. We feel that the medical evidence as a whole discloses that the petitioner did suffer a disc injury which would disable him from performing his duties as a truck driver. Dr. Kirgis was very definite in his opinion, and as a fact, was so definite in his opinion as to recommend surgery. He took into consideration the length of time which had elapsed since the accident, and felt that, due to the history and symptoms found on his examination, surgery was definitely justified. Most of the other doctors who examined petitioner did so prior to Dr. Kirgis' examination, and it appears that they felt that the symptoms might disappear in due time, however, as Dr. Bannerman stated "if his progress is not satisfactory over the next month or so have him return for further examination."
There is no serious question as to the compensation allowed petitioner by the Lower Court, and we feel that same was justified by the evidence. On this score, therefore, the judgment of the Lower Court will be affirmed.
Nor do we find any error in the award of penalty as per the provisions of LSA-R.S. 22:658. According to this section of law and the cases of Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695 and Richard v. Traders & General Ins. Co., La.App., 62 So.2d 533, the plaintiff is entitled to penalty and attorney's fees if he can prove that his compensation was discontinued capriciously, unlawfully and arbitrarily and without probable cause. It is stipulated in the record "that the first draft was mailed to the employer July 29, 1952 in the amount of $55.26 covering the period of July 16, 1952 through July 29, 1952; that the second draft was mailed to the employer on August 11, 1952 in the amount of $27.63, covering compensation from July 30, 1952 through August 5, 1952; the third draft was mailed to the attorney on August 21, 1952 in the sum of $82.89, covering the period of July 9, 1952 through July 15, 1952; and that draft also the period from August 6, 1952 through August 19, 1952; the fourth draft was mailed October 4, 1952 in the sum of $165.78, it was sent the attorney covering the period August 20, 1952 through September 30, 1952; the fourth (fifth) draft was mailed to the attorney on October 14, 1952 in the sum of $55.26, covering the period October 1, 1952 through October 14, 1952; the sixth draft was mailed November 14, 1952 in the sum of $39.47 covering the period of October 15, 1952 through October 24, 1952" which was the date of discharge by Dr. Rozas. As stated hereinabove the accident occurred on July 8, 1952. Plaintiff was treated by Dr. Rozas from July 9, 1952 until October 24, 1952 at which time he was discharged on the strength of the statement made by the plaintiff to the doctor that he was well and able to return to work. It appears from the evidence that on September 16, 1952 Dr. Gilly reported to defendant that petitioner would be disabled for at least four months and recommended traction. It was after the use of this traction as recommended by Dr. Gilly and applied by Dr. Rozas that petitioner advised Dr. Rozas that he thought he was able to return to work, and Dr. Rozas notified defendant that he was discharging petitioner because he was able to return to work. However petitioner immediately learned that he was not able to use his back and defendant was so notified by letter of counsel for plaintiff on November 19, 1952 apprising them that plaintiff's back was still in pain and that he was unable to do any type of work similar to what he was doing at the time of injury. It should be pointed out here that Dr. Gilly's prognosis was that plaintiff would be disabled for at least four months from September 16, 1952 which was the date of his letter to defendant. That being true, plaintiff would have been disabled until approximately the middle of January, 1953. According to the record petitioner was examined by Dr. Bannerman on December 22, 1952 and he reported to defendant on January 13, 1953 that plaintiff might be able to return to work in four to six weeks. It is to be remembered that during all this period of time, petitioner, through his attorney, was making demand upon defendant to *105 resume compensation payments to plaintiff, which they failed to do despite the fact of all the medical reports thus had in their possession. Then again petitioner furnished defendant with a report of Dr. Kirgis on March 20, 1953 which report was dated March 16, 1953 on an examination made on February 21, 1953. Still the defendant failed to pay compensation as is required by law. Suit was then filed on June 19, 1953. Of course after the suit was filed, plaintiff was examined by defendant's Dr. Karr on November 23, 1953, but at the time that suit was filed defendant was in possession of reports of Dr. Gilly, Dr. Bannerman and Dr. Kirgis, all to the effect that plaintiff at the time of said reports, was disabled. Defendant only had one report from the local general practitioner Dr. Rozas that he had discharged plaintiff on October 24, 1952 because as stated in his report on said date "patient stated (10/24/52) that he was well and able to return to work." In view of the fact that counsel for plaintiff had notified defendant on November 19, 1952 that plaintiff's back was paining him again and he was unable to work, and in further view of the fact of the medical reports that were in defendant's possession during said period of time and immediately thereafter and before and at the time suit was filed, we are of the opinion that defendant's failure to resume plaintiff's compensation payments at that time was capricious, arbitrary and without probable cause and that the penalty allowed by the Lower Court will be affirmed.
As to claim for medical expenses, the petitioner failed to furnish proof. The only medical expenses shown in the record were paid by defendant. Although the provisions of LSA-R.S. 23:1203 allows medical expenses not to exceed $1,000, such expenses must be proved. In the case of Hibbard v. Blane, La.App., 183 So. 39, 43, Justice Hamiter, the then organ of said court, stated:
"`Under the act an injured employee is entitled to medical and surgical expenses not exceeding $250.00 but unless he spends or becomes obligated for that much he cannot recover that amount. In any event, he cannot recover more than he proves.'"
Likewise in the case of Sewell v. W. Horace Williams Co., La.App., 12 So.2d 33, 35, Justice LeBlanc, the then organ of said court, said:
"With regard to the $250 allowed for medical expenses we find that the evidence fails to show that plaintiff expended any amount whatever or that he became obligated in any way for medical treatment, and under the authority of Finley v. Texas Co., La.App., 162 So. 473 and Hibbard v. Blane, La. App., 183 So. 39, he is not entitled to recover on that item."
As no medical expenses were proved by the petitioner the award of medical expenses by the Lower Court will be reversed and the judgment amended. We note, however, that Dr. Kirgis has recommended an operation. We therefore believe that plaintiff's rights should be reserved in the matter to claim future medical and hospital expenses.
Under the provisions of the compensation law, LRA-R.S. 23:1141, the maximum attorney's fee shall not exceed the sum of $1,000. We feel, therefore, that the award for attorney's fees below should be reduced accordingly.
For the reasons assigned, the judgment below is amended so as to strike out the award for medical expenses, and reserving unto plaintiff his right to claim future medical and hospital expenses on a future operation as recommended subject to credit to defendant for medical expenses expended on his behalf and to reduce the award for attorney's fees to the sum of $1,000, and as so amended, the judgment below is affirmed. All costs of this appeal are to be paid by defendant.
Judgment amended and as amended affirmed.