95 So.2d 201 (1957)
Terra GUILLORY, Plaintiff-Appellee,
v.
COAL OPERATORS CASUALTY COMPANY, Defendant-Appellant.
No. 4403.
Court of Appeal of Louisiana, First Circuit.
May 2, 1957.
Rehearing Denied June 4, 1957.
Writ of Certiorari Granted October 8, 1957.
*202 Gravel, Humphries, Sheffield & Mansour, Alexandria, for appellant.
Paul C. Tate, Mamou, for appellee.
TATE, Judge.
Defendant insurer appeals from a judgment awarding plaintiff workmen's compensation for total and permanent disability, medical expenses, and also penalties and attorney's fees for the arbitrary and capricious nonpayment of compensation due. Plaintiff-appellee answers the appeal requesting an increase in the weekly compensation rate.
At 7:30 P.M. on June 23, 1954, plaintiff Miss Guillory suffered a tear of the medical meniscus or cartilage of her right knee when she stepped into a ditch en route to put out a fire in the "heater-treater" equipment of her employer, The Sunnyland Contracting Company, Inc. As a result of this condition, she suffers pain when walking or climbing, both necessary incidents of her employment, and her knee occasionally locks. It is a progressively worsening condition. There is no serious dispute that at time of trial plaintiff was permanently and totally disabled under our jurisprudence from performing duties of occupations similar to that in which engaged at the time of the accident. See, e. g., Bean v. Higgins, Inc., 230 La. 211, 88 So.2d 30.
At the time of the injury, Miss Guillory was employed at a salary of $75 per month as "pumper" to check and gauge the production of two oil wells situated on her father's property, upon which she resided with her parents and also to "treat" the produced oil for pipeline shipment once or twice a month, when sufficient production had accumulated.
The regular daily duties of gauging the oil accumulating in the storage tanks by the wells took approximately one hour, including about five minutes to record the production findings on a daily report form.
The monthly or semi-monthly regularly recurrent duty of "treating" the oil, which was regarded as the main work of the job (Tr-68), involved lighting the heater of the "heater-treater", which was a large (6' × 8') firebox or furnace, lit by sticking a burning rag therein to light the pilot flame, and then turning the main burner on. (Tr-60.) The oil was then circulated from the well storage tanks through the "treater" tank, where it was heated to 180 to remove the impurities, and then recirculated back to the well storage tanks for shipment in its more purified and fluid state. This process of "treating" the oil took plaintiff from eight to ten hours each time.
*203 Plaintiff further reported any difficulties or disorder in the equipment under her charge to her employers' main office at Rayne. She was in fact at the time of her injury endeavoring to investigate and to extinguish a fire in her employer's equipment situated about 600' from her home.
The District Court correctly found that plaintiff's employer was engaged in one of the trades, businesses, or occupations specifically classified as hazardous by our compensation act. LSA-R.S. 23:1035 specifies among the hazardous businesses: "The operation * * * maintenance * * of * * * oil, gas, sulphur, salt or other wells * * *. The * * * operation of boilers, furnaces, engines and other forms of machinery." Plaintiff's employer was clearly engaged in the operation of oil and gas wells, and the duties of plaintiff clearly included the regular operation of a boiler and/or furnace, namely the "heater-treater".
Plaintiffs' duties are among those within the principal physical operations of a business specifically designated as hazardous by the act so as to entitle her to compensation when injured in the course of these duties. Malone, Louisiana Workmen's Compensation Law, Section 98 et seq., p. 116. When the Legislature has specifically declared a business to be hazardous, "it is not open to the courts to question this classification, or to attempt to segregate the ordinary work involved in such operation into hazardous and nonhazardous duties, and then affirm the coverage of the act as to one and deny it to the other." Fontenot v. Myers, La.App. 1 Cir., 93 So.2d 245, at page 247.
Even were this not a business specifically denominated as hazardous by the act, plaintiff's duties included the regular performance of hazardous work in connection at least with the operation of the "heater-treater", so as to entitle her to coverage of the act when injured whether performing hazardous or nonhazardous duties. Byas v. Hotel Bentley, 157 La. 1030, 103 So. 303. Further, actually plaintiff's injury was sustained in connection with her responsibilities pertaining to the hazardous "heater-treater", as she was on her way to investigate and to put out a fire in this apparatus when she fell, causing the injuries which resulted in her present disability. These observations are pertinent chiefly in relation to defendant's efforts to exculpate itself from liability for penalties arising from non-payment of compensation to a disabled employee which the District Court found to be arbitrary and capricious and without probable cause.
In its defense that the employee's duties were non-hazardous so as not to be within the coverage of the compensation statute, defendant-appellee in a very able brief relies upon such factually inapposite cases as Dewey v. Lutcher Moore Lumber Co., 151 La. 672, 92 So. 273, where the employee was not engaged in the principal physical operations of a business specifically designated as hazardous by the compensation act, and Rayburn v. De Moss, 194 La. 175, 193 So. 579, which the Supreme Court characterized as based upon a finding "as a fact that the defendant's business was not hazardous within the meaning and contemplation of the act `since he was engaged in farming and dairying and not in the repairing or construction business'", Speed v. Page, 222 La. 529, 62 So.2d 824, at page 825.
Computing the compensation rate, the learned District Court divided the annual salary at the time of the accident of $900 ($75 per month) by the 52 weeks of the year, arriving at $17.31 as the weekly wage, 65% of which provided a weekly compensation rate of $11.25.
Defendant insurer urges that it should be given credit against this compensation liability for the continued payment of monthly wages of $75 per month, subsequently reduced to $50 per month (when one of the wells on plaintiff's father's tract *204 of land was closed down). In the first place, defendant is clearly not entitled to any credit whatsoever for payment of wages after December 1, 1954, when the firm of Hicks and LeBlanc bought the lease from plaintiff's employer and defendant's insured, Sunnyland, Hicks and LeBlanc having operated these wells since that date. Although the employer responsible for workmen's compensation may sometime receive credit by payment of wages against such compensation liability, the wages received from other employers are never available for such purposes. Malone, Louisiana Workmen's Compensation, Section 402, p. 517 (footnote 7); Gautreau v. Maryland Casualty Co., La.App. 1 Cir., 28 So.2d 96; cf., Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695.
Further, as to the wages paid by plaintiff's employer between June 23, 1954 (date of injury) and December 1, 1954 (date of her transfer of employment), the uncontradicted facts reveal that plaintiff's father performed the duties of her job following the date of the disabling accident and up through the trial, due to plaintiff's physical inability to perform same; plaintiff simply completing the daily report forms, due to her father's inability to read and write, which took about five minutes per day. She and her father divided the wage payment, which continued to come by check in her name. Under such circumstances, as the District Court noted, in effect the employer paid a third person (plaintiff's father) to perform the duties and received the full benefit of any money so paid.
The reason that wage payments made to an admittedly disabled employee are sometimes credited against compensation liability as payments made in lieu of compensation, is that under these circumstances such payments constitute a joint recognition by the employer and the employee of the latter's "industrial disability, and an implied agreement to pay and to receive these wage payments in lieu of compensation", since such "wages paid a disabled employee are more than commensurate with the services rendered and the employee is not actually earning all of his pay," Scalise v. Liberty Mutual Insurance Co., La.App. 1 Cir., 84 So.2d 88, at page 93. The facts of the present case do not indicate that the employee continued to receive full pay for the performance of lighter duties through joint acquiescence and mutual recognition of disability, but that a third person was paid to perform such duties, although the check was made out in the employee's name, and although the employee received from this third person a portion of the wages so paid for her nominal assistance for about five minutes per day in transcribing the reports.
Chiefly on the ground that because of these continued wage payments defendant may have reasonably felt entitled to withhold payment of weekly compensation, the defendant vigorously assails the award of the District Court of 12% penalties and attorney's fees under LSA-R.S. 22:658 for the arbitrary and capricious failure to pay compensation due a disabled employee without probable cause. As was remarked above, whatever the merits of such defense were we concerned solely with alleged credit due by wages paid directly by defendant's insured, the employer liable for workmen's compensation benefits, there is absolutely no merit to such claim for credit from the successor employer who paid plaintiff's wages after December 1, 1954.
As above remarked also, the very able brief and argument of counsel for defendant designed to establish that plaintiff's employment was not covered by the compensation act does not convert into a serious dispute questions well settled by prior jurisprudence.
However, we do feel to be meritorious the defendant's plea to reduce the attorney fees awarded as penalties to $1,000, the maximum recoverable in compensation cases under LSA-R.S. 23:1141, and under Gloston v. Coal Operators Cas. Co., La.App. 1 Cir., 85 So.2d 100, 105, for penalties in such cases under LSA-R.S. 22:658. The *205 District Court had awarded $1,500 penalties for the attorney's fee in procuring payment of weekly compensation, and an additional $269.25 attorney's fee for the services in procuring the judgment for unpaid medical expenses in the amount of $807.75.
Defendant-appellant alternatively argues that the attorney's fees should be reduced to $900, which is 20% of the $4,500 (400 weeks at $11.25 per week), of total weekly compensation payments allowed herein. LSA-R.S. 23:1141 simply limits the fees of an attorney "who renders services for an employee coming under the provisions of this Chapter" to "twenty per centum of the amount of the award, provided that the maximum fee shall in no case exceed one thousand dollars", and does not prohibit the charge of the statutory attorneys' fee upon unpaid interest for delinquent installments nor (although customarily this charge is perhaps not made) upon recovery of medical expenses (which in this case amounted to $807.75 which the defendant refused to pay), recovery of both of which by the employee is enabled by the attorney's services to the latter. See Anderson v. International Creosoting & Constr. Co., La. App. 2 Cir., 41 So.2d 688, 689, awarding as attorney's fee "twenty per cent of all amounts collected under this judgment, not exceeding however a total of $1,000", 41 So. 2d 692, which judgment specifically awarded in addition to compensation the amount of $139 for medical expenses.
Thus collectible under the present judgment, exclusive of penalties and attorney's fees, is more than $5,000, including compensation and medical expenses and interest thereupon.[1] Therefore the attorneys could recover the statutory maximum of $1,000, which penalty the Gloston case approved.
By answer to the appeal, plaintiff-appellee raises a very serious question in urging increase of the weekly compensation rate from $11.25 to $30 per week.
Counsel for plaintiff argues that her monthly compensation of $75 was paid for approximately 50 hours work per month (one hour per day in checking and gauging the daily oil production, plus 10-20 hours of "treating" the oil for shipment), or at the rate of approximately $1.50 per hour. It is firmly established that the purpose of the compensation act is to insure the employee against the loss of earning capacity, and that therefore the rate of weekly compensation should be based upon the rate of weekly earnings, based upon the employee being paid an hourly wage for a 48-hour week, i. e., six days per week, 8 hours per day. Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399, Troquille v. Lacaze's Estate, 222 La. 611, 63 So.2d 139, Jarrell v. Travelers Ins. Co., 218 La. 531, 50 So.2d 22, 23. In the latter case, the Supreme Court very forcefully stated that the award of compensation should be based, not on the actual wage, but on "the person's ability to work at full time employment in the future".
But despite plaintiff's very forceful argument, we think the present case involves a factually distinguishable situation.
While plaintiff worked a limited and varying number of hours per month, the record indicates that a factor in her pay was her availability if trouble should arise in the work premises immediately adjacent to her home.[2] Thus her daily wage was not based *206 upon the actual or varying number of hours worked monthly for $75, but upon her availability during the major portion of the hours of each day and night.[3]
Plaintiff educed some extremely impressive testimony from her present employer, Hicks, who had purchased the interest of Sunnyland, to the effect that she is paid simply for the actual hours worked. However, Hicks' testimony indicates he was cognizant of the possible implication of testimony that plaintiff was on duty 24 hours each day, 7 days per week, with relation to application of the federal Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., providing for minimum wages of $1 per per week. And reading his testimony as a whole,[4] and in conjunction with the other testimony in the record, we find nothing which requires a conclusion contradictory to that expressed above.
We therefore agree with the District Court that the just solution under the rather individual facts and circumstances of the present case is to award compensation at the rate of $11.25 per week, based upon the premise that the plaintiff's daily rate of pay was not only for hours actually worked but for her availability during the entire day.
Through inadvertence the 12% penalties under LSA-R.S. 22:658 were based upon the entire award, which might be interpreted so as to include future compensation to accrue, whereas under Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695, and the subsequent jurisprudence, the 12% penalty has only been assessed against payments delinquent at the time of judgment. The decree will be amended accordingly.
For the above and foregoing reasons, the judgment in favor of plaintiff is amended by reducing the total attorney's fee awarded as penalty to $1,000, and by limiting the 12% penalty to the medical expenses and compensation payments now due, with a like penalty on all such payments which might become 60 days overdue in the future; and as thus amended, it is affirmed in all other respects. Defendant to pay the costs of these proceedings.
Amended and affirmed.
NOTES
[1] In the writer's personal opinion, the attorneys' fee allowed as penalty in compensation cases shall never exceed $1,000 under the Gloston ruling, but is not limited to 20% of the total award in cases where the maximum recoverable under the award is under $5,000. But this question, upon which the court as a whole disagrees, is not presented to us by the facts of this appeal.
[2] Cf. her testimony, Tr-32-33: "Q. Do you take general care of the lease the whole day? A. Whenever there is something to do I do it, it don't matter what time it was, sometime at 10:00 at night to take the test. Q. If anything came up during the day or night it was your job to see it was taken care of? A. It was my duty, but usually nothing would happen, until the first time the treater went bad, that is the only trouble I had." And at Tr-37: "Q. Suppose the fire broke out at 1:00, A.M. was it your duty to go see about it? A. Yes. Q. At any time? A. At any time; when I did not have work to do I could go just anywheres."
[3] Thus her daily wage, upon which the compensation rate must be based, should be calculated by dividing the $900 annual wages, by the 365 days per year, rather than by dividing the $75 by the actual number of hours worked per month. Since an employee is not limited to a forty-eight week when actually working in excess thereof, see Troquille case above cited, 63 So.2d 139, the District Court properly computed plaintiff's weekly wage rate as based upon a 7-day week, arriving at the same result by dividing the annual wage by the 52 weeks of the year; as by dividing the annual rate by the number of days of the year, then multiplying by 7.
[4] Cf., Tr-65: "A. The advantages I guess I saw is that they were landowners, although their work only required very little time each day. I am certain she goes and comes as she pleases; by the same token, living there, I would expect if her father were there and something went wrong she would hear about it more than somebody going there for thirty (30) minutes." Cf. Tr-70: "Q. Your testimony is not I presume that you always want the land-owner to be your pumper? A. No, that is very seldom that I have heard of that, really, I thought the only reason we bought that lease is because that situation was as such, because the production was not enough to pay somebody; I don't know what they usually pay a pumper, but I imagine they make Two-Hundred ($200.00) Dollars or Two Hundred and Fifty and No/100 ($250.00) Dollars a month, we only pay her Fifty and No/100 ($50.00) Dollars; we could not do it if she had to drive to her work and drive back."