276 So.2d 762 (1973)
Mack WHITE, Individually and for the Use and Benefit of the Minor, John Allen White, Plaintiff-Appellee,
v.
E. A. CALDWELL CONTRACTORS, INC., et al., Defendants-Appellants.
No. 4144.
Court of Appeal of Louisiana, Third Circuit.
April 25, 1973.
*763 James A. Bolen, Jr., Alexandria, for defendants-appellants.
Ford & Nugent by Howard N. Nugent, Jr., Alexandria, for plaintiff-appellee.
Before SAVOY, MILLER and DOMENGEAUX, JJ.
SAVOY, Judge.
This is a suit in workmen's compensation. Mack White, appearing individually and for the use and benefit of his minor son, John Allen White; said son being designated in these proceedings as "plaintiff," alleged that plaintiff, on the 25th day of November, 1969, sustained a cut on the medical aspect of his right lower leg and ankle; which ultimately resulted in severe infection of the right lower leg, necrosis of the tissue of the right lower leg; and severe scarring of the left tissue and supportive soft tissue structures of the right lower leg. Plaintiff also prayed for medical expenses and also for penalties and attorneys fees for the alleged arbitrary and unreasonable refusal of defendant to pay plaintiff compensation benefits. The defendant filed an answer in the form of a general denial, and also specifically denied that there was ever any notice or proof of loss by the plaintiff to the employer or insurer; and also that no accident had been sustained by plaintiff on November 25, 1969, which resulted in any disability. The matter was tried, and after being submitted to the trial court, the trial court rendered its memorandum decision as follows:
"The Court is of the opinion that the plaintiff has proven an accident in the course and scope of his employment, under the jurisprudence of this state. Dortch v. Louisiana Central Lumber Company, 30 So.2d 792, La.App. 2 Cir. (1947); Cutno v. Neeb Curney & Company, Inc., et al., 237 La. 828, 112 So.2d 628 (1959); Gloston v. Coal Operators, 85 So.2d 100 (La.App.1st Cir. 1955).
"The Court is of the opinion that plaintiff is permanently and totally disabled. The testimony of Dr. Prevost reveals this without doubt.
"The defendant was not unreasonable, arbitrary or capricious in refusing to pay this plaintiff compensation benefits."
The defendants filed a Motion for a New Trial. The Court denied said Motion for a New Trial, with the following written reasons:
"The defendant has filed and earnestly argued a motion for a new trial contending *764 that the plaintiff had not proven an accident and had not proven permanent disability. The Court denies the motion for a new trial.
"The plaintiff did not convincingly and beyond a reasonable doubt prove the occurrence of an accident. There are many cases wherein the proof of the accident is much more satisfactory than in this case. Nevertheless, the plaintiff has proven an accident by a preponderance of the evidence as established by the jurisprudence of the State of Louisiana.
"The Court is still convinced that the plaintiff is totally disabled from performing the same or similar work that he was performing prior to the accident. It is true that his condition may go into a state of remission but the history is that after short episodes of hard manual labor there is an exacerbation of the condition of his leg."
From the judgment, defendants appealed suspensively to this Court. Plaintiff did not appeal nor answer the appeal, and consequently the question of penalties and attorney's fees is not before us.
The record reveals that the job site of the employer defendant, E. A. Caldwell, was near DeRidder, Louisiana, in connection with the construction of a paper mill for Boise Cascade Company. It was stipulated that plaintiff was receiving wages sufficient to entitle him to the maximum rate of compensation, which was $45.00 per week at that time. Plaintiff alleged that he was driving a water truck, and due to the fact that he had to have the water cut off at the proper moment, he hastily jumped up to catch a lever and push it up, he came back down and cut his right ankle. The plaintiff stated that one of the reasons he could mention the date clearly was because it was on the Tuesday before Thanksgiving, which for that year would have been on the 27th day of November.
Raymond Davis, a co-employee of plaintiff at the time of the accident, testified that, although he did not see the accident as he was not in the immediate vicinity, plaintiff told him that he had "skinned" his ankle and showed him the mark on his skin. This witness testified that he told plaintiff that if it (the injury) was bothering him he should tell Mr. Kennedy, their foreman. The foreman, Bill Kennedy, testified that he did not have any recollection of the plaintiff reporting to him that he had cut or injured his lower leg, although he admitted it was possible that it could have happened and he did not make a mental note of it. The plaintiff did testify that he had "hollered" to Bill Kennedy and showed him his ankle and that was the extent of any report to his foreman. Kennedy testified that minor cuts and lacerations, etc. would ordinarily not be reported anyway.
Plaintiff's father, Mack White, testified that some time around the end of November his son told him he scraped his leg when he had slipped while trying to cut off a valve at the rear of a truck. There was some confusion in his testimony as to exactly when his son told him, but he thought "it must have been around the last of November." He did also state that the plaintiff would stay off his leg and it would seem like it was going to get well, but as soon as the boy would go back to work it would be just a short time until the leg would get inflamed again.
Insofar as treatment for this injury was concerned, it is quite evident that plaintiff considered this to be a minor injury and had no idea it would develop into what it did. He testified that the evening after the accident he got some gauze and salve and wrapped his ankle. He said he kept it wrapped and put mercurochrome on it after that. He stated that the cut place never did get completely well, and it just kept getting worse.
The first doctor plaintiff saw relative to his right leg was Dr. Bennett W. Sewell, a general practitioner. He saw plaintiff on one occasion, which was March 30, 1970. *765 Dr. Sewell testified that plaintiff had an infection of the skin of his ankle and infectious dermatitis of the right lower leg above the ankle. This doctor prescribed an antibiotic, cortisporin, to clear up the infection. He did not see the plaintiff after that day.
The next doctor to see plaintiff relative to his injury was Dr. O. William Hilton, a general practitioner of Alexandria, Louisiana. Dr. Hilton testified that he saw plaintiff in the emergency room of Baptist Hospital in Alexandria on June 27, 1970. He testified that plaintiff had first been to Dr. Spruill's office, as Dr. Spruill was the family physician for plaintiff. Since Dr. Spruill was out of town plaintiff was sent to the hospital by Dr. Spruill's office nurse. He saw the plaintiff only for a brief time. The history the plaintiff gave to him at the time was recorded in his report as follows:
"... stated that for the previous six months he had sores on the right lower leg which would almost heal completely then apparently would become infected again."
Dr. Hilton said that plaintiff had a cellulitis resulting from an infection of the right lower leg. Cellulitis was defined by the doctor as an "inflammation of an area involving the skin and the tissue just beneath it." Dr. Hilton was shown two photographs of the plaintiff and his leg which were taken on September 15, 1970, and introduced into the record as plaintiff's exhibits P-#2 and P-#3. Dr. Hilton said the photographs revealed a condition much more pronounced than when he saw it, although the general area of the cellulitis at the time of his examination covered the approximate area that appears to be on the photographs. Dr. Hilton prescribed antibiotics for the plaintiff and told him to remain on limited activity and to use hot soaks to the lower extremity. He told plaintiff to see Dr. Spruill, his family doctor, on Monday, June 29th.
Dr. Hilton did state that it would be painful for the plaintiff to work on his leg in the condition that he saw at the time of his examination on June 27, 1970, and further stated that activity would perhaps precipitate further infection also. Dr. Hilton said that limited activity would be important. This doctor was rather reluctant to venture any definite opinions as to length of disability, causation, etc., as he saw the plaintiff on only one occasion, and stated that he would defer to Dr. Spruill.
Plaintiff reported to Dr. Fern Rayford Spruill, a general practitioner, on June 29, 1970, as directed by Dr. Hilton. Dr. Spruill said that at that time the plaintiff gave him the history of an injury "some times in 1969 in November." He testified that the plaintiff had a swelling and a contusion with bluish discoloration of the lower right leg. Plaintiff complained of pain in the lower right leg, and it was visibly swollen. Dr. Spruill said that his findings of an infection of the leg would be consistent with a history of plaintiff having sustained a cut or tearing type wound on November 25, 1969. This doctor stated that the infectious condition he saw on June 29, 1970 had evolved into a thrombophlebitis, with the injury of November, 1969 as a precipitating event. Dr. Spruill recommended rest, antibiotics, and elevation of the leg with warm packs. He said the leg responded well, but plaintiff kept working. The doctor thought that if plaintiff had stayed off of this leg longer it would have healed faster. This doctor examined the plaintiff in the court room on the day of trial (March 15, 1971) and said the leg was not healed, and further that it was susceptible to re-injury and could be predisposed toward infection. When asked if he would recommend that plaintiff engage in heavy manual labor or any sort of activity requiring that he stand on his feet for long periods of time, the doctor stated that it would be better for him to have light weight work that he could do and not stand on the leg as much. He said definitely there was discoloration and swelling *766 visible on the day of trial when he examined plaintiff's leg. Dr. Spruill saw plaintiff five times, and the last time was on August 22, 1970. Dr. Spruill felt that it would take awhile for the condition to clear up, but plaintiff would always have a scar that would be susceptible to re-injury or re-infection because of slight trauma or chaffing. The doctor did recall on at least one occasion telling the plaintiff not to go back to work.
Dr. Hubert L. Prevost, a general practitioner of Rapides Parish, Louisiana, testified that he had plaintiff under his care from September 17, 1970 to February 8, 1971. On the first visit, plaintiff gave Dr. Prevost the history of striking his leg on a truck. Dr. Prevost made a diagnosis of dermatitis with cellulitis and edema. This doctor stated that the condition he found was consistent with a history of trauma involving a break in the skin in November of 1969. Dr. Prevost next saw plaintiff on September 21st, and stated that the patient was not giving himself the personal care he was instructed to. He instructed him in foot care and personal cleanliness, and saw plaintiff a week later, on September 28th, at which time it appeared better. On September 30th the area on the leg was considerably better. He told plaintiff to return in three days, but plaintiff did not return until October 7th, a week later. At that time, the wound did not look as well as it should have, because the dressing had been on so long and the area was "macerated." The doctor defined this as meaning "he had been sweating and the rubbing of the dressing just sort of beat the wound up." He said the plaintiff returned on October 10th and the wound looked pretty good but it would have looked a lot better if he had not been scratching it. The doctor said the wound apparently itched terrifically and plaintiff "just couldn't keep his fingers off of it." On examining the plaintiff's leg in the court room on the day of the trial, Dr. Prevost found swelling and discoloration on the foot. He marked on Exhibit P-#3 the extent of the redness and discoloration, covering an area approximately 12 centimeters in length. The doctor felt that the condition of plaintiff's leg while under his care was disabling, and would cause pain. Dr. Prevost further stated that when plaintiff went back to work it might not give him trouble right away but within a week or ten days plaintiff would be in trouble again. Dr. Prevost testified that he saw plaintiff in October of 1970 for injuries sustained in an automobile accident on October 15th, which included a fracture of the outer third of the right collarbone (clavical) and a laceration of the right leg on the outside of the leg, a smaller laceration of the left leg, and multiple contusions and abrasions. He stated there was no re-injury or trauma to the area inside the right ankle.
This doctor was definitely of the opinion, which included an examination of plaintiff's condition as revealed to him by examination on the date of trial, that plaintiff was still disabled. The doctor said plaintiff "has a bad leg, he has got a nasty leg, and he has got a disabling leg." This condition would make plaintiff very susceptible to re-injury or re-infection by slight trauma or chaffing, prolonged standing, bumps, or any other kind of trauma. The doctor said it would be possible perhaps to alleviate the condition somewhat by performing a lumbar sympathectomy, majory surgery, which means going in and cutting the nerves along the lumbar vertebrae. Skin grafts would also be required.
The doctor said he last saw plaintiff in his office on February 8, 1971, and he stated:
"He had gone back and tried to work and it did what I had predicted, it brokeit flared up the edema, cellulitis, stasis dermatitis, a weeping, raw looking leg."
The doctor further stated:
"He cannot tolerate heavy manual labor without a flare-up of his extremity. Within a week, at the most two weeks, he is going to be in trouble every time. *767 This is something that is just about consistent, it doesn't take but just 7 to 14 days until he has got trouble."
The defendant introduced the testimony of two physicians, both of whom examined plaintiff for pre-employment examinations. The testimony of Dr. Charles Cucchiara of Metairie, Louisiana was taken by deposition relative to a pre-employment examination he conducted on plaintiff on May 27, 1970. The doctor examined him at the Doctors General Hospital, Family Industrial Clinic, in Belle Chasse, Louisiana. As a result of this examination, plaintiff was given an "A" rating, meaning that he was physically qualified for heavy industrial labor.
Introduced into evidence along with Dr. Cucchiara's deposition was a medical examination record filled in on the basis of information given by plaintiff. On this form it is indicated that White once had varicose veins, but there is no amplification or explanation of this on the form. According to the form, there were no previous injuries, no operations, and plaintiff stated at that time on the form that no compensation claims were pending. (This is true, because no claim was made until October 7, 1970). Also introduced along with said deposition was a record of the pre-employment examination conducted by the doctor. The doctor said the examination was completely negative and he did not find any abnormalities at all with the right lower leg or ankle, or, as the doctor put it, "according to my records, none." When he was asked as to whether the plaintiff filled out the medical examination report, the doctor replied:
"I really could not tell you who filled it out because we do multiple physicals, 20 or 30 patients at a time. The page is on the door when we go in to see the patient. Either the nurse fills it out or they have him do it previously. I could not tell you."
The doctor was emphatic in saying that if there had been any kind of infection on the right leg or ankle of the nature as shown in plaintiff's photographs in Exhibits P-#2 and P-#3, he would have seen it. However, he had no recollection of even seeing that particular man that day. Under cross-examination he said it might be possible that a person could have left his socks on and that could have been a reason for his failing to note something of that nature. The whole tenor of his testimony appears to be that at the time of his examination, plaintiff did not have a condition as obvious as revealed by P-#2 and P-#3. Of course, it might be mentioned here that the history as related by the claimant, and as related by the doctors that treated the plaintiff, was to the effect that his condition would get better and subside with inactivity and then it would flare up after activity. Since this was a pre-employment examination, it is certainly conceivable that the inactivity preceding this examination had cleared plaintiff's condition to where it wasn't so obvious.
Defendant also tendered the testimony of Dr. M. E. Gutierrez, a general practitioner of Alexandria, Louisiana, who examined plaintiff on January 13, 1970, relative to a pre-employment examination for the Flynn Manufacturing Company. He stated that the only thing he saw out of the ordinary was what he thought was some residual scarring of the right ankle. He did state that the main concern in the pre-employment examination such as this was hernias and gross defects. Dr. Gutierrez at one time stated that he assumed this scarring was due to phlebitis at age 5. Upon further questioning, however, he stated that phlebitis was probably not the precipitating cause, because phlebitis in a youngster at age 5 would be very rare. He then stated that a history of some trauma involving cutting or tearing of the flesh in the medial aspect of the right ankle would be more consistent with the condition that he found on his examination. He was shown the pictures (P-#2 and P-#3), taken September 15, 1970, and stated that he could say that plaintiff's leg was nothing like *768 that when he saw him. He stated upon examining plaintiff's leg in Court that the scarring he observed at the time of his pre-employment examination was in the general vicinity of the scarring present on the day of trial, but was much more extensive at the time of the trial than it was at the time of the pre-employment examination. He stated that there was no way plaintiff could have passed the examination if he had presented himself with a condition such as reflected by the photographs taken on September 15, 1970. He did say that he certainly did not pass plaintiff for employment with a condition like that.
Considering all of the evidence, we agree with the trial court that plaintiff is totally and permanently disabled under the provisions of the Workmen's Compensation Law. We agree with the statement of the trial judge that "it is true that his condition may go into a state of remission but the history is that after short episodes of hard manual labor there is exacerbation of the condition of his leg." (See ruling on Motion for New Trial, supra). One of the reasons the physicians' testimony has been outlined in some detail is also addressed to the question of the causal connection between the alleged injury of November 25, 1969 and the obviously disabling condition plaintiff had on the day of the trial, March 15, 1971.
In addition to the testimony of Dr. Cucchiara and Dr. Gutierrez, as outlined above, defendant also produced the testimony of three lay individuals; F. M. Boring, Gertrude H. Nabours, and Delores Ann Seal.
F. M. Boring, of Gretna, Louisiana, a personnel director for Brown & Root, Inc., testified that John Allen White was employed by Brown & Root on May 27, 1970, after taking a physical examination in Belle Chasse, Louisiana on May 27, 1970. This was the pre-employment examination made by Dr. Cucchiara, mentioned above. He stated that plaintiff was hired as a structural welder at $4.00 per hour. Mr. Boring testified that the last day plaintiff worked was on September 11, 1970. He also testified that the plaintiff never complained to him, or anyone that he personally knew of, that he could not perform his job. Regarding the termination of White's employment, referring in particular to the date of September 11, 1970, Mr. Boring testified:
"That was his last day of work. He was removed from our payroll records on October 17thforhe was for the reason fired excessive absenteeism. He was carried on our payrolls from 9/11/70 to 10/17/70 without working during that period."
(It should be noted here that plaintiff reported to Dr. Prevost for treatment of his leg on September 17, 1970, six days after the last day he worked for Brown & Root.)
Mr. Boring also stated that the plaintiff was given another pre-employment examination on December 29, 1970, and at that time plaintiff filled out a Brown & Root medical examination record, a copy of which was introduced into evidence as defendant's exhibit # 6. However, on the examination record as given by plaintiff, it is shown that Dr. Hubert L. Prevost of Alexandria was the doctor who had previously taken care of the plaintiff for "ankle and broken bone." Also plaintiff checked where it said "leg injury." Also, and perhaps more significant, is that in the blank on the form after the question "Have you any compensation claim pending?" The answer is "Yes (E. A. Caldwell)." There is no explanation in the record as to why Brown & Root employed plaintiff after being put on notice that he had a compensation claim pending, but the way plaintiff had the form filled in shows he was not trying to conceal his status or condition.
Mr. Boring testified that plaintiff entered the payroll records on December 30, 1970 and was taken from the records on January 25, 1971, and the reason for the *769 termination was that: "He quit marking (sic)off poor health." (The correct word is obviously "working.") This witness also testified as to the time between December 29, 1970 and January 25, 1971, that out of four weeks there was only one complete week worked by plaintiff. He did point out that weather could have been possibly a factor in this.
Miss Delores Ann Seal of Baton Rouge, Louisiana, an employee of E. A. Caldwell, Contractor, testified that according to the records she had, plaintiff went to work for Caldwell on November 20, 1969, as a laborer. She testified that on November 24th her records showed that plaintiff had worked 10 hours as had other members of the crew, whose names were Eddie East, Joe Johnson, Raymond Davis, Thomas Bacon and Arthur Taylor and John White. According to her testimony, plaintiff missed only the days the other men missed because of rain and probably weekends. She further testified as to the procedure for reporting accidents, and stated plaintiff made no such report, according to her records.
Mrs. Gertrude H. Nabours of Woodworth, Louisiana, an employee of Flynn Manufacturing Company, had in her possession the employment work records of plaintiff. She testified that plaintiff's first day of work was January 13, 1970, the date of his examination by Dr. Gutierrez. Her records showed that May 22, 1970 was the last day he worked. She further stated that in April and May there were occasions when plaintiff didn't make a full 40 hours because "he did go to the doctor occasionally during these periods."
Bill Kennedy, who was called on cross and then subsequently examined by defendant, testified that he was the foreman of plaintiff during the period of time encompassing the date of November 25, 1969, but he testified that he had no recollection of plaintiff reporting to him that he had cut or injured his right lower leg. He did say that it was possible that he could have made such a report and he did not make a mental note of it. He pointed out that more or less small cuts, skins and lacerations are not considered things of importance insofar as injuries are concerned. In things of a minor nature he did not expect the worker or employee to file an accident report. He stated definitely that plaintiff never made any complaint of injury while on the job up until the time he left, and did not make one at the end of that period. When asked as to the type of worker the plaintiff was he said he took his work real good and was happy-go-lucky, as he phrased it.
As to the burden of proof in workmen's compensation cases, it is true that although legal rules and procedures are construed liberally in favor of a workmen's compensation claimant, the burden of proof by a preponderance of evidence is not relaxed and remains the same as it is in other civil cases. Guillory v. New Amsterdam Casualty Company, 244 La. 225, 152 So.2d 1 (1963). It is also equally true that the trial court's findings and conclusions are entitled to great weight and will not be disturbed on appeal unless they are manifestly erroneous. Brown v. Allen, 253 So.2d 611 (La.App. 3 Cir., 1971).
It is quite evident that the trial judge in this case gave serious consideration to the contention of the defendants that plaintiff had not proven an accident in the course and scope of his employment. The court points that out in its memorandum decision and also in its ruling on Motion for a New Trial. We cannot help but agree with the trial court, especially in view of the fact that the occurrence of the accident was not only substantiated by plaintiff's co-employee, it was further substantiated by plaintiff's father and the other relevant circumstances of the case, including the medical testimony. The trial court had the opportunity to observe the demeanor of the witnesses, and was in a better position to evaluate their testimony than this court is.
*770 We think the issue of causation here falls within the set of circumstances envisioned in the case of Bourque v. Monte Christo Drilling Corporation, 221 So.2d 604 (La.App., 3rd Cir., 1969) wherein it is stated (221 So.2d 606):
"Further, a claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, provided that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disability condition." (Citing Gates v. Ashy Construction Company, La.App., 171 So.2d 742, and other cases.)
Learned counsel for appellants, contending that Dr. Gutierrez described plaintiff's condition as "stasis phenomenon", urges that since this type of condition is usually progressive, the jurisprudence does not allow recovery for such a condition. Cited in support of this contention are the cases of Gaspard v. Petroservice, Inc. (La.App., 3rd Cir. 1972), 266 So.2d 453; and Schernbeck v. Argonaut Insurance Company, La.App., 212 So.2d 742. An examination of these cases, however, does not substantiate appellants' contention. In the Gaspard case, plaintiff contended that he was working in connection with a screening machine which vibrated 1,750 times per minute, and that the vibration had caused him to develop a disabling condition. It was established that plaintiff was suffering from a neurological disorder referred to as Raynaud's Phenomenon, or sympathetic dystorphy. The court stated that even if the plaintiff's condition had been proved to be due to the cumulative effect of the vibrations, his exposure to the vibrations of the machine did not constitute an "accident" as that term is defined in the statutes and explained in the overwhelming weight of the jurisprudence. In the Schernbeck case the plaintiff was disabled as the result of a stroke incurred after he had sustained an aggravation of a pre-existing arthritic condition in his cervical spine following an injury to his neck in an automobile accident. The court held that the mere coincidental fact that a pre-existing vascular condition flared up so as to interfere with treatment of the effects of the accidental injury did not entitle the plaintiff to recover for the extended period of disability caused thereby, when the medical evidence clearly established that the plaintiff's injury caused symptoms that would have been cured in a relatively short period of time if a stroke had not intervened. Also the court held that the vascular condition was not aggravated by the accident. We fail to see how this case supports appellant's contention.
All in all, the trial court found that plaintiff had sustained an accident, and that the accident had resulted in total and permanent disability. Certainly there was ample credible evidence to support this finding of the trial court, and we certainly cannot find any manifest error in the trial court's determinations of fact. Accordingly, the decision must be affirmed at the cost of defendant-appellants.
Affirmed.