CHEHARDY, Judge.
Plaintiff, Emmette Gremillion, appeals a district court decision in favor of defendants, Babst Services, Inc., et ais., and against the plaintiff, dismissing his claims for workmen’s compensation benefits at his costs.
As part of his judgment, the trial court judge stated:
“Petitioner Emmette Gremillion contends that he is totally and permanently disabled due to the inhalation of carbon monoxide fumes while he operated a machine called a ‘cherry picker.’
“The machine did not have a cab, and Mr. Gremillion sat on one end while the exhaust was at the opposite end, at least 10 feet away.
“After considering the testimony of the various witnesses, medical and otherwise, the Court cannot conclude that Mr. Grem-illion proved that his disability, whatever it is, was causally related to his operation of the ‘cherry picker’.
“The preponderance of the medical evidence indicates that Mr. Gremillion is hypertensive and has borderline retardation of long standing but no organic brain damage due to his employment.”
At a trial on the merits of the case the plaintiff testified that on December 11, 1974 he was employed by Babst Services, Inc., as a heavy equipment operator, and specifically he had been operating a piece of machinery or vehicle commonly called a “cherry picker” for a year and a half or two years prior to his disability. He described it as having four rubber wheels and a boom, and he stated it used gasoline as fuel. He added that the machine had no cab for the driver, nor did it have a windshield.
The plaintiff testified he operated the machine five days a week, eight hours a day, sometimes also doing “a lot” of overtime. When asked about the condition of the cherry picker, Gremillion said it smoked a lot and that smoke would come from both sides and whichever way the wind would be shifting “sometimes it would come right up in your face from the bottom.”
*677 The plaintiff further testified that on December 10, 1974 he started feeling weak, was making a lot of mistakes, and he assumed he must have passed out because he urinated on his clothes. He added that on December 11, 1974 he began to feel weak and dizzy and left work, later passing out on the highway and subsequently calling his wife who took him to a hospital.
Dr. Joseph Braud, a general practitioner, testified that on examining the plaintiff in the emergency room of Flint-Goodrieh Hospital on December 11, 1974 he found him to be apprehensive, confused and talking irrationally; that he had difficulty walking; and that he had multiple complaints in reference to his head, back and legs. He said he received positive findings on the Babin-ski test done on the plaintiff indicating some neurological damage, but that a skull x-ray and electroencephalogram were normal. He felt at the time that the plaintiff had an acute brain syndrome. The doctor added that plaintiff’s blood pressure was 160 over 120.
Dr. Braud had continued to see the plaintiff over the intervening years and up until the time of trial. He noted that Gremil-lion’s generalized complaints of nervousness, headaches, dizziness, pain in his back and upper legs continued. Dr. Braud opined that the plaintiff was in need of maintenance and supportive therapy on an indefinite or perhaps a permanent basis and explained he has treated him with various tranquilizers, muscle relaxants, as well as medications for the headaches and dizziness. As of June 1976 Dr. Braud’s reports indicated he thought Gremillion may have a conversion reaction and should be evaluated by a psychiatrist. He also said that based on the history of his condition, he felt in all probability the plaintiff had had a reaction from inhaling toxic fumes and, subsequently, his acute brain syndrome led into a conversion type of reaction. This physician did not feel the plaintiff would ever be able to work again.
Dr. Charles Moan, a clinical psychologist, testified he had examined and tested the plaintiff and the overall results of the testing indicated a person of borderline intelligence who seemed to be displaying no specific brain damage, no localized brain damage, but that borderline retardation was found indicating a generalized organic problem. Dr. Moan stated he did not test the plaintiff for a conversion reaction nor did his testing rule out his having had an acute brain syndrome in December of 1974.
Dr. Robert Davis, a psychiatrist, evaluated the plaintiff on three occasions in 1976, 1977 and 1979 and testified there was evidence of organic brain dysfunction manifested primarily by his confusion and disorganization. He stated the findings of a CAT scan, a sophisticated x-ray of the brain, which he ordered for the patient to undergo, was normal. He also stated that when he received the results of a neurological examination done by Dr. Maria Palmer he revised his diagnosis to a conversion reaction, a psychological response to stress which is a type of neurotic mental illness. Dr. Davis also said that assuming Gremil-lion had had an acute brain syndrome, such a severe stress could trigger off the conversion reaction. He also stated that, in his opinion, the plaintiff was disabled to the extent he could no longer be a heavy equipment operator.
Dr. Palmer, a neurologist, testified that when she examined the plaintiff in January of 1977 her impression, from his history and symptoms, was that he had been exposed to something that had caused him to have an acute organic brain syndrome which was characterized by the headaches and confusion and passing out. She added that exposure to carbon monoxide can be cumulative, depending on how severe it is.
Dr. Raeburn Llewellyn, a neurosurgeon, testified he examined the plaintiff in May of 1975. At that time, he said he was impressed with his uncomfortableness, felt that he was incapacitated and should have hospitalization. He also said the symptoms he found in the plaintiff at that time could have been precipitated by inhalation of fumes in December of 1974, although he stated a problem such as that falls within the specialty of the medical neurologist.
*678 Dr. Tom Oelsner, an expert in the field of internal medicine, said he examined Gremil-lion in May of 1976. In regard to whether the symptoms exhibited in the past and at the time he saw the plaintiff could be due to any toxic substance which he inhaled, the physician explained:
“Well I think that sufficient exposure to gasoline exhaust fumes can produce some of these symptoms on an acute basis. That is if one gets sufficient carbon monoxide in particular then one can be overcome by it and actually lose consciousness but prior to losing consciousness one might develop dizziness and headaches and ultimately confusion and ultimately lose consciousness. However, once the patient is removed from the exposure to these exhaust fumes and provided he survives the exposure to the exhaust fumes then the carbon monoxide are exhaled over the succeeding time usually a maximum of twenty-four hours so the symptoms should be gone. The fact that he was never overcome by the fumes during exposure would indicate to me that the symptoms that he was experiencing subsequent to the exposure are not related to it. In other words, the worse symptoms are during exposure and they would diminish with the passage of time. In his case his symptoms were less severe during exposure and got worse on his way home.”
Dr. Oelsner further said that assuming the plaintiff had exposure to carbon monoxide in open atmosphere he doubted he would get significant symptoms at all. Relative to his being exposed outdoors, he said he would have to question whether something else was causing his illness.
Dr. William Martin testified he examined the plaintiff in January of 1979 and found very little evidence to suggest a significant organic brain syndrome. He said if a man had enough exposure to carbon monoxide to cause an organic brain dysfunction or damage to a brain, then an electroencephalogram ought to show that, particularly if it were taken on the same day as the injury. He added most Babenski signs are unreliable. He also said the effect of inhalation of fumes cannot be a cumulative thing unless he was continuously working for 24 hours a day because if exposure is interrupted the carbon monoxide is replaced with oxygen.
The plaintiff’s wife confirmed Gremil-lion’s description of the events of December 11, 1974 and she also testified he was in perfect health before that date.
Emile Babst of Babst Service, Inc., testified the machine operated by the plaintiff did not smoke abnormally. He said Gremil-lion came to see him some weeks or months after he left his employ and seemed depressed. Although he was having a lot of financial problems, the plaintiff was not sick and did not mention that he had inhaled any fumes from machinery.
Bulton Brindall, superintendent on the job where Gremillion was working in December of 1974, stated the gas-operated machine used by the plaintiff did not smoke excessively and he did not receive complaints in that regard. He said he had received complaints from the plaintiff’s coworkers about mistakes he was making on the job. He also said when he called the plaintiff in, Gremillion stated the doctor had suggested he take several weeks off and that was the last time Brindall ever saw him. Harry Kovner, another superintendent at Babst in December of 1974, also testified the machine used by Gremillion was completely open, without a windshield, and that he knew nothing of the machine smoking excessively.
Edward A. Coon, Jr., the foreman on the job worked by Gremillion at the time of his illness, testified the machine used by the plaintiff did give off an excessive amount of smoke, that either the muffler or pipe was broken on it, and also that the smoke had a tendency to blow over the machine; however, he also said, contrary to the statements of the plaintiff and all other witnesses in this regard, that the machine had a front windshield.
In the recent case of Lindsey v. H. A. Lott, Inc., 387 So.2d 1091, 1092 (La.1980), the court stated:
*679 “As in any other civil suit the plaintiff in a workmen’s compensation action has the burden of establishing his disability and the causal relation between it and the accident by a preponderance of the evidence. This court has held, however, that a claimant’s disability is presumed to have resulted from an accident if, before the accident, the injured person was in good health, the symptoms of the disabling condition appearing after the accident and manifesting themselves continuously afterwards, providing there is a reasonable possibility of causal connection between the accident and the disabling condition. Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977); Gradney v. Vancouver Plywood Co., 299 So.2d 347 (La.1974); Johnson v. Travelers Insurance Co., 284 So.2d 888 (La.1973).”
In that case, moreover, the court also said at 1092-1093:
“As noted above, if a plaintiff in good health continually suffers from a disabling condition after an accident, and there is a reasonable possibility that the accident caused the condition, the condition is presumed to have been caused by the accident. In this case the evidence is uncontradicted that the plaintiff had no problems with his hand and arm before the accident, but that afterwards he was in continuous pain. The medical testimony was clearly to the effect that the accident was at least a reasonably possible cause of the condition for which the plaintiff was diagnosed. It was therefore error for the trial court to fail to apply the well established presumption that such conditions are caused by the incidents which they follow. We conclude that the plaintiff has met his burden of proving by a preponderance of the evidence that his disabling condition was caused by the accident he suffered while in the employ of the defendant.”
The court specifically noted in Lindsey v. H. A. Lott, Inc., supra, however: “In this case it is not disputed that the plaintiff had an accident while on the job, which he reported to his superiors.”
In this case of Prim v. City of Shreveport, 297 So.2d 421 (La.1974), the court also made the following statement at 422:
“Although procedural rules are construed liberally in favor of workmen’s compensation claimants, the burden of proof, by a preponderance of the evidence, is not relaxed. Thus, the testimony as a whole must show that more probably than not an employment accident occurred and that it had a causal relation to the disability. If the testimony leaves the probabilities equally balanced, the plaintiff has failed to carry the burden of persuasion. Likewise, the plaintiff’s case must fail if the evidence shows only a possibility of a causative accident or leaves it to speculation or conjecture. Jordan v. Travelers, 257 La. 995, 245 So.2d 151 (1971); Hebert v. Your Food Processing & Warehouse, Inc., 248 La. 197, 177 So.2d 286 (1965); Hogan v. T. J. Moss Tie Co., 210 La. 362, 27 So.2d 131 (1946); White v. E. A. Caldwell Contractors, Inc., La.App., 276 So.2d 762 (1973); Richard v. Guillot, La.App., 271 So.2d 719 (1972); Nellon v. Harkins, La.App., 269 So.2d 542 (1972).” (Emphasis ours.)
Our reading of Prim v. City of Shreveport, supra, in combination with statements made by the court in the Lindsey case, therefore, leads us to conclude that in a workmen’s compensation case there are two separate issues to be addressed, i. e., whether an employment accident occurred and, additionally, whether it had a causal relation to the disability. Although, as noted in the Lindsey case, a claimant’s disability is presumed to have resulted from the accident if, before the accident, the claimant was in good health, this presumption does not relieve a claimant from the additional burden of showing that, more probably than not, an employment accident of some kind did occur. Prim v. City of Shreveport, supra.
As noted above, there was some medical testimony that exposure to carbon monoxide can be cumulative and there was also some medical testimony the plaintiff *680 evidenced organic brain dysfunction. Contrary to what was said by Brindall, Babst and Kovner, there was also testimony by the plaintiff and his foreman, Coon, that the machine did smoke excessively. However, as the court aptly stated in Southern Bell Tel. & Tel. Co. v. Roy Cook & Sons, Inc., 218 So.2d 404 (La.App. 2d Cir. 1969) at 407:
“It is a well settled principle that the trial judge’s findings on questions of fact, and particularly questions involving credibility of witnesses who testify before him are entitled to great weight on appeal and will not be disturbed unless clearly erroneous. Barlotta v. Walker, 223 La. 157, 65 So.2d 122 (1953); Fairman v. Robert, La.App., 181 So.2d 459 (1st Cir. 1965); United Public Insurance Company v. Levy, La.App., 154 So.2d 80 (4th Cir. 1963). Even when the trial judge makes no written findings of fact the resolution of conflicting testimony is necessarily made in rendering judgment and the presumption of correctness applies with equal force. Rembert v. Bonvillain, La.App., 202 So.2d 320, 323 (1st Cir. 1967); Dupuy v. Iowa Mutual Insurance Company, La.App., 113 So.2d 830, 832 (1st Cir. 1959); Fruge v. White, La.App., 125 So.2d 426, 427-428 (3rd Cir. 1960).”
The testimony of Dr. Oelsner and Dr. Martin, as well as the testimony that the machine did not have a cab, in combination with testimony from Brindall, Babst and Kovner that the machine did not even smoke excessively, all strongly support the district court’s conclusion the plaintiff failed to establish that more probably than not there was an employment accident, in spite of the fact it was established the plaintiff did become ill while he was employed by Babst Services, Inc.
For the reasons assigned, the trial court decision is affirmed.
AFFIRMED.