418 So.2d 637 (1982)
Emmette J. GREMILLION
v.
BABST SERVICES, INC. and U S F & G Insurance Company.
No. 81-C-3201.
Supreme Court of Louisiana.
July 2, 1982.
Dissenting Opinion July 16, 1982.
Rehearing Denied September 3, 1982.
*638 Albert S. Dittmann, Jr., Charles A. Kronlage, Jr., Kronlage, Dittmann & Maselli, New Orleans, for applicant.
S. Frazer Rankin, Montgomery, Barnett, Brown & Read, New Orleans, for respondent.
DIXON, Chief Justice.
This is a workmen's compensation case involving a claim of total and permanent disability from an acute brain syndrome followed by a conversion reaction.
Recovery was denied by both lower courts. The trial court concluded plaintiff failed to prove that his disability was causally related to his employment. On appeal the decision was affirmed on the ground that an employment accident was not established by plaintiff. 405 So.2d 675 (La.App. 1981).
Plaintiff was employed by Babst Services, Inc. as a heavy equipment operator. For about a year and a half prior to the alleged accident, he had operated a crane, known as a cherry picker. The driver of a cherry picker sits immediately in front of a turntable to which a boom is anchored. Behind the turntable is the engine; the exhaust is expelled at the back of the engine. The distance between the operator and the exhaust pipe on the machine used by the plaintiff was variously estimated at between six and fifteen feet. The particular machine driven by plaintiff was manufactured by Galion, with a six cylinder gasoline powered engine and a forty foot boom. Babst also owned several Pettibone cherry pickers which had Diesel engines. Unlike the Pettibone machines, the Galion had no cab or windshield to protect the driver from inclement weather. Gremillion testified that he worked with the cherry picker five days a week for eight hours a day. Bulton Brindall, plaintiff's supervisor, stated that plaintiff was the primary operator of the Galion and that the cherry pickers were in operation an average of five to six hours each day.
On December 10, 1974 plaintiff began feeling weak, and made several mistakes on the job; he believed that he must have "passed out" because he urinated on himself. He apparently recovered from the incident enough to keep working until quitting time. However, on December 11, 1974 Gremillion again felt weak and dizzy. He told Brindall that he "couldn't go no more." Brindall testified that he remembered plaintiff telling him he was sick. Since Brindall had received complaints from a couple of men in the same crew as Gremillion that he almost dropped a load of pipe on them, Brindall suggested that the plaintiff take some time off from work. Plaintiff left the job site in St. Rose, Louisiana and headed toward home in his automobile. He lost consciousness in a parking area in Kenner, Louisiana. When he regained consciousness, Gremillion telephoned his wife and told her he was "feeling bad." He was taken to Flint-Goodridge Hospital.
Dr. Joseph Braud, a general practitioner, examined plaintiff in the emergency room. At that time, plaintiff was weak, confused, *639 talking irrationally and complained about his head, back and legs. An electroencephalograph, x-rays and a Babinski test were run. The test results were normal, although the Babinski test was equivocal.
Plaintiff had a history of hypertension. Although not contained in the emergency room report, Dr. Braud testified that he "felt at the time the fellow had an acute brain syndrome." This diagnosis was actually recorded after plaintiff's next visit to Dr. Braud on December 13, 1974. Dr. Braud continued seeing Gremillion up until trial. Plaintiff persistently complained of headaches, dizziness, weakness in his legs and nervousness. Dr. Braud prescribed tranquilizers, muscle relaxants, medicine for dizziness and headaches, as well as blood pressure medicine at various times during his treatment. According to index cards kept by Dr. Braud, plaintiff was examined on June 16, 1975 and again on June 20, 1975. An entry in between these dates states that plaintiff operated a machine at work and had been inhaling fumes.[1] Dr. Braud explained that this information was not supplied earlier because plaintiff was incoherent during the first examinations, "similar to a vegetable," and gradually improved his ability to express himself. On June 25, 1976 Dr. Braud concluded that Gremillion "may" have a conversion reaction. In his opinion, plaintiff is totally disabled.
In 1976 plaintiff was evaluated by two clinical psychologists, Dr. Charles Moan and Dr. Judith Feldman. Dr. Moan found that Gremillion had chronic borderline mental retardation. He did not conduct a personality test to determine whether plaintiff had a conversion reaction; he stated that a conversion reaction is generally triggered by an overwhelming crisis such as a death in the family or the loss of a limb. When questioned as to the effect of inhalation of exhaust fumes, Dr. Moan opined that intellectual functioning might be temporarily worsened. He explained that inhalation of a toxic substance usually has a shotgun effect; that is, it affects some areas of the brain but not all. In those affected areas, a depressed level of functioning would be found. Thus, in the instant case, Dr. Moan testified that he would expect to find some impairment to certain areas such as the frontal lobe. However, no evidence of organic brain damage was seen in the frontal area. Dr. Feldman's findings corroborated those of Dr. Moan in that she concluded plaintiff was mentally retarded (borderline) and that this condition was of long-standing. She did not diagnose a conversion reaction, although she stated that this reaction would be "consistent."
Dr. Robert Davis, a psychiatrist, examined Gremillion on three occasions, in 1976, 1977 and 1979. His initial impression was organic brain syndrome. After receiving normal results on a CAT scan and brain x-rays, Dr. Davis decided that there was no organic cause for plaintiff's symptoms. Rather, Gremillion's brain damage was of long-standing. In light of an evaluation by Dr. Maria Palmer, a neurologist, Dr. Davis revised his diagnosis to conversion reaction (this diagnosis is not written in any of Dr. Davis' reports). Dr. Davis noted that although the claimant believed his condition was caused by the exhaust fumes, he could not make a causal connection between plaintiff's condition and the inhalation of fumes. He felt that the brain damage was definitely not caused by the fumes.
Dr. Palmer saw the claimant in 1977. She found that plaintiff had suffered an acute organic brain syndrome. On the basis of the history supplied by Gremillion, she concluded that the syndrome was caused by the fumes "or by any other cause." She could not say whether plaintiff's condition was caused by the brain damage itself or by psychological factors associated with his illness in December of 1974. In her opinion, the exposure to carbon monoxide "can be or cannot be" cumulative depending on the duration and concentration of the exposure.
*640 Dr. Raeburn Llewellyn, a neurosurgeon, saw Gremillion in May of 1975. Dr. Llewellyn was impressed by plaintiff's "uncomfortableness" and thought plaintiff was incapacitated. He diagnosed hypertension and opined that Gremillion might have a hypertensive cardiovascular disorder; he felt the claimant should be hospitalized so that his blood pressure could be studied. When asked hypothetically if plaintiff's condition could have resulted from inhalation of carbon monoxide, Dr. Llewellyn qualified his answer, stating that if the smoke caused the episodes in December of 1974, then the residual effects a year later might be related.
Dr. Tom Oelsner, an internist who saw plaintiff in May of 1976, found that plaintiff suffered from hypertension and obesity. He reviewed the reports of five other doctors, including that of Dr. Braud, plaintiff's physician. The reports of two doctors who saw plaintiff in 1968 revealed back problems. The history given by the claimant to Dr. Oelsner was weakness, dizziness and headaches due to exhaust fumes. At the time of the examination, Dr. Oelsner recorded plaintiff's weight at 203 pounds, height 5' 8", blood pressure of 150/100. His diagnosis was cardiovascular disease due to hypertension which might have impaired the circulation to the brain and caused the symptoms. He noted that Gremillion was never overcome by fumes while actually exposed; in his opinion, it would be extremely difficult to be overcome by fumes in an open environment. Dr. Oelsner considered it important that plaintiff was never in a closed area with the machine and that no other workers got ill from the same exposure. Once removed from the exposure, Dr. Oelsner felt that the symptoms should disappear in twenty-four hours. Dr. Oelsner testified that these facts indicated the symptoms experienced by Gremillion were not related to carbon monoxide exposure.
The findings of Dr. William Martin, a neurologist, confirm those of Drs. Llewellyn and Oelsner. Dr. Martin examined plaintiff in January of 1979. At that time, Dr. Martin found no evidence of a conversion reaction. He stated that carbon monoxide poisoning would not be cumulative unless an individual was continuously exposed for long periods of time. Further, if there was severe carbon monoxide poisoning, it would show up on an EEG taken shortly after the exposure. The fact that a normal EEG was taken on December 11, 1974 mitigated strongly against any serious condition involving the brain.
Aside from the medical testimony, several witnesses testified about conditions on the job site. Emile Babst, the president of Babst Services, testified that the Galion cherry picker did not smoke abnormally. No complaints had been received from any of the workers about the machine smoking and no repair records existed for the machine. Babst said that Gremillion came to his office a few months after he had left and talked to Babst about the financial troubles he was having; he confided to Babst that he was in "absolute financial distress." Gremillion appeared depressed. Due to Gremillion's past work performance, Babst tried to get him to return to work in some other capacity. He loaned plaintiff some money to help plaintiff out.
Bulton Brindall also testified that he had not received any complaints about the Galion machine. He unequivocally stated that the Galion did not smoke excessively; the other cherry pickers which had Diesel engines smoked much more than the machine operated by Gremillion. The testimony of Harry Kovner, another superintendent at Babst, corroborated that of Brindall. Kovner testified that he never saw the Galion smoking. His workers used the Galion after plaintiff left and no complaints were received; during this time period, Kovner was at the job site once or twice each week.
Edward Coon, Gremillion's foreman during the Tank Terminal job, testified that the Galion cherry picker gave off "excessive amounts of smoke" either because the muffler was broken or because of a hole in the exhaust pipe. He stated that he had complained about the machine. Although not sure, Coon said that the Galion machine had *641 a windshield and might have been a Diesel. Both of these statements were contradicted by all of the other witnesses. On cross-examination, Coon retreated somewhat from his earlier testimony, stating that the machine smoked when started up and when accelerated.
The theory of recovery advanced by plaintiff is that the initial symptoms experienced on the job were caused by the inhalation of exhaust fumes from the cherry picker. In response to these symptoms, Gremillion suffered an acute brain syndrome. Due to his inability to cope with this mental condition, plaintiff underwent a conversion reaction. Plaintiff does not suggest that the inhalation of carbon monoxide fumes caused brain damage; indeed, it is undisputed that plaintiff's mental retardation is of longstanding. Rather, he argues that the weakness, dizziness and blackouts caused him to become hysterical or delirious, a condition later manifested by a conversion reaction.
An acute brain syndrome is commonly called delirium and results from an overwhelming stress; according to Dr. Braud, the patient voices "bizarre complaints and we don't know what exactly is causing them." A conversion reaction is a psychological response to stress; it is a neurotic condition characterized by psychosomatic complaints.[2] The most common example of a conversion reaction is paralysis of a limb. The reaction is used by the individual subconsciously as a defense mechanism by which he can cope with stress.[3] It may be more prevalent among unsophisticated individuals who are less able to deal with emotional problems.[4]
The medical testimony reveals that the plaintiff is a borderline mentally retarded person, and that this condition was not caused by an work related incident. Also, the consensus of medical opinion is that Gremillion is totally disabled, for whatever reason. There is much dispute, however, as to whether anything on the job caused or contributed to the disability. The only connection between the conversion reaction and plaintiff's employment is the episodes of dizziness, weakness and unconsciousness which Gremillion experienced while at work. The questions then become: do these episodes constitute an employment accident, and is the disability causally related to the accident?
As in any other civil suit the plaintiff in a workmen's compensation case has the burden of establishing the disability and the causal relation between it and the accident by a preponderance of the evidence. A claimant's disability is presumed to have resulted from an accident if, before the accident, the injured person was in good health, the symptoms of the disabling condition appearing after the accident and manifesting themselves continuously afterwards, providing there is a reasonable possibility of causal connection between the accident and the disabling condition. Lindsey v. H. A. Lott, Inc., 387 So.2d 1091 (La.1980); Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977).
In the instant case, there is insufficient evidence that Gremillion suffered an employment accident. A claimant is entitled to compensation benefits only where he has sustained "personal injury by accident arising out of and in the course of his employment." R.S. 23:1031. The term "by accident" involves an examination of whether there is an accidental result or effect on the employee, rather than whether the disability had an accidental cause. Ferguson v. HDE, Inc., 270 So.2d 867 (La. 1972). See 1B A. Larson, Workmen's Compensation *642 Law, § 38.10 (1980). The evidence is not convincing that there was an accidental injury to Gremillion occasioned by exposure to toxic fumes. The evidence reveals that Gremillion was doing the same work under the same conditions which he had carried out without complaint for over a year prior to the episodes. None of the other workers, exposed to the same amount of carbon monoxide fumes (or perhaps more, if working with the Pettibone cranes) for approximately the same length of time, manifested any adverse effects. The medical testimony does not tie the symptoms reported by Gremillion in December of 1974 to the inhalation of fumes. Indeed, the testimony indicates that carbon monoxide poisoning would have to be of prolonged duration and high concentration in order to cause side effects of more than momentary significance.[5] Both the EEG and the CAT scan were negative for brain damage. As Dr. Martin characterized them, Gremillion's symptoms resembled flu as much as any other ailment. Gremillion did become ill on the job. Except for "occupational diseases" and cardiovascular or cerebral accidents which meet the requirements of "personal injury by accident" (R.S. 23:1031), illnesses are not compensable merely because they manifest themselves while on the job.
In Prim v. City of Shreveport, 297 So.2d 421, 422 (La.1974), this court stated:
"Although procedural rules are construed liberally in favor of workmen's compensation claimants, the burden of proof, by a preponderance of the evidence, is not relaxed. Thus, the testimony as a whole must show that more probably than not an employment accident occurred and that it had a causal relation to the disability. If the testimony leaves the probabilities equally balanced, the plaintiff has failed to carry the burden of persuasion. Likewise, the plaintiff's case must fail if the evidence shows only a possibility of a causative accident or leaves it to speculation or conjecture...."
The preponderance of the evidence refutes the plaintiff's theory that the inhalation of carbon monoxide fumes played any part in the episodes related by him. There has been no showing that plaintiff was injured by accident.
For these reasons, the decision of the Court of Appeal is affirmed at plaintiff's costs.
DENNIS, J., concurs with reasons.
CALOGERO, J., dissents and assigns reasons.
WATSON, J., dissents.
DENNIS, Justice, concurring.
I concur in the result reached by the majority. I choose not to join with the majority because of the following language contained in the opinion:
Except for "occupational diseases" and cardiovascular or cerebral accidents which meet the requirements of "personal injury by accident" (La.R.S. 23:1031), illnesses are not compensable merely because they manifest themselves while on the job.
This sentence implies that a cardiovascular or cerebral accident which meets the requirements of "personal injury by accident" is compensable merely because it manifested itself while on the job. Such a statement ignores the statutory requirement that the accident arise out of the employment, La.R.S. 23:1031, and is contrary to this court's holding in Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626 (La. 1982) rendered on the same day as this opinion.
CALOGERO, Justice, dissenting.
Plaintiff Emmette J. Gremillion was a most conscientious worker according to his supervisors, Bulton K. Brindall and Edward A. Coon, and his employer, Emile M. Babst, *643 who specifically described Gremillion as being a good worker who was enthusiastic and dependable.
He had been employed by Babst Service, Inc. for about five years as a heavy equipment operator. He had only a fifth grade education and was a borderline retardate. He operated the same machine (a crane, commonly referred to as a cherry picker) for about a year and a half prior to December 10 and 11, 1974, the last day on which he worked. There was testimony that Gremillion was a very accommodating employee, always trying to do what his foreman and other supervisors wanted him to do. He occasionally stayed after hours to practice with his crane to improve his work performance.
According to all of the evidence in this record there is no question but that Mr. Gremillion is not now malingering. He is genuinely suffering from a mental disorder, diagnosed as conversion reaction. He is completely disabled. The jurisprudence indicates that a worker can receive worker's compensation benefits for a disability resulting from mental disorder provided there is a causal connection between the disorder and the work accident. Carter v. Avondale Shipyards, Inc., 308 So.2d 472 (La.App. 4th Cir. 1975); Miller v. United States Fidelity and Guaranty Co., 99 So.2d 511 (La.App. 2d Cir.1957), writs denied (La.1957); Dupre v. Wyble, 85 So.2d 119 (La.App. 1st Cir. 1955).
While the majority's view is not an implausible one based on this record (that there was no work accident), I find the more plausible conclusion to be that there was a work accident that has left this plaintiff permanently and totally disabled.
There is testimony in the record to the effect that Mr. Gremillion had been suffering with headaches at night when he got home from work for about five months prior to the accident. On such occasions he took aspirin. Gremillion believed his headaches were caused by exposure, during the workday, to an excessive amount of fumes emitted from the crane he operated five days a week, for six to eight hours a day. Both he and his foreman, Edward A. Coon, testified that this particular crane smoked excessively. Plaintiff testified that his coworkers used to tease him about the smoke. Coon testified that the crane smoked excessively because of a hole in either the muffler or the exhaust pipe. Coon further testified that he had complained about the machine, but that it had never been repaired. Contrary testimony was given by some supervisory personnel, but these persons were not on the work site with the regularity of either Coon or Gremillion. One of the supervisors, Bulton K. Brindall, testified that although he did not think there was anything wrong with the machine plaintiff operated, that Coon and Gremillion would be in a better position to know about that.
On December 10, 1974, after working a good part of the day, plaintiff testified that he began feeling weak and dizzy and began making a number of mistakes. (Mr. Brindell testified that his co-workers had complained that Gremillion had almost dropped a load on them.) He testified that he must have passed out because he found that he had urinated on himself. Plaintiff believed that these ill feelings were due to the excessive amount of smoke. The next day, December 11, 1974, plaintiff began working. At some point he again started feeling dizzy and weak and he stopped working to tell his supervisor about his feeling ill. He testified that he asked to be allowed to go home. On his way home from the jobsite he passed out. He telephoned his wife from a pay phone on the side of the road. He was taken to the hospital that evening. He has been totally disabled since that time.
There is no dispute over whether the incident took place. His supervisor confirmed plaintiff's testimony that plaintiff had reported his feeling ill on December 11, 1974. The questionable point is whether the illness was brought on by the inhalation of smoke. Plaintiff believes they were. He has since that time been suffering from a conversion reaction and is totally disabled. As already indicated plaintiff is not malingering. Minimally, plaintiff suffered some symptoms of an illness while on the job.
*644 He is now diagnosed as suffering from a conversion reaction. A conversion reaction is used subconsciously by an individual, usually with limited intelligence, as a defense mechanism by which he can cope with stress. The conversion reaction from which he is now suffering has been associated with the ill feelings plaintiff experienced on December 10th and 11th, at work or is a result of them. It therefore may be irrelevant whether the dizziness, etc. was brought on by the smoke inhalation or not, since the illness manifested itself at work, causing plaintiff severe stress which has resulted in his disability.
As pointed out by the majority, plaintiff herein benefits from the presumption of causation established in Lindsey v. H. A. Lott, Inc., 387 So.2d 1091 (La.1980):
A claimant's disability is presumed to have resulted from an accident if, before the accident, the injured person was in good health, the symptoms of the disabling condition appear after the accident and manifest themselves continuously afterwards, providing there is a reasonable possibility of causal connection between the accident and the disabling condition.
In this case, plaintiff was in good health prior to this occurrence. Since then he has been totally disabled. At trial defendants did not show that plaintiff's dizziness and weakness were not brought on by the inhalation of the fumes. On the contrary plaintiff presented the testimony of Dr. Joseph Braud, plaintiff's treating physician, who gave the following testimony:
I felt that the fellow's condition was caused by inhaling toxic fumes. I think he had been inhaling toxic fumes for a period of time, which I don't know how long. All I know is that he tried to do something for himself. I didn't get a history where he had gone to any other doctors or what have you. He had been taking B.C.'s on his own trying to make it and then he got to the place where he couldn't make it anymore. I think it was because he had inhaled these fumes over this period of time.
The majority seems to rely heavily on the testimony of two other doctors who testified that plaintiff's present symptoms were not related to carbon monoxide poisoning. However, that testimony is really irrelevant, because plaintiff does not contend that his present symptoms are caused by carbon monoxide poisoning. Rather, plaintiff contends that the initial symptoms experienced on the job (dizziness, weakness and fainting), were caused by the inhalation of the smoke from the machine he was operating. In response to these symptoms, Gremillion experienced a great deal of stress (possibly caused in part by a dangerous mistake he had made while operating his crane on the day in question where he almost dropped a load of pipe on his coworkers, for which he was reported and called to his supervisor's office.) The stress reaction was diagnosed, by Dr. Braud, as acute brain syndrome. Then, because of plaintiff's limited mental capacity, he was unable to cope with the stress. This precipitated the conversion reaction which has left him totally disabled. Furthermore, the two doctors who testified unfavorably did not see the plaintiff until May of 1976 and January of 1979, two and five years after the accident, whereas Dr. Braud, whose testimony supported plaintiff's claim that the inhalation of the fumes caused the initial symptoms, was the treating physician who saw plaintiff the evening of the occurrence.
As stated in the majority opinion, "[t]he term `by accident' involves an examination of whether there is an accidental result or effect on the employee, rather that whether the disability had an accidental cause." From all of the evidence in the record, especially the fact that plaintiff has been totally disabled since the dates of these incidents at work, I would conclude that there was a work related "accidental result or effect" on this plaintiff which occurred on December 10 and 11, 1974 and thereafter. In my opinion plaintiff has proven his entitlement to worker compensation benefits.
NOTES
[1] On cross-examination, it was brought out that the date "6-1-78" appears next to this notation. Dr. Braud was unable to remember why this entry is found in between visits or why this date was written on the card. He guessed he might have conversed with Gremillion over the telephone or made the notation during the prior visit.
[2] Psychiatric Dictionary 123 (2d ed. Hinsie & Shatzky 1953). See Dorland's Medical Dictionary 340 (24th ed. 1965).
[3] See the testimony of Dr. Davis. A conversion reaction is a psychologic process in which the patient defends himself against painful feelings by developing physical symptoms. In other words, the patient unconsciously "converts" a psychologic problem into a physical one. The physical symptoms replace and distract the patient from painful emotions. Imboden & Urbaitis, Practical Psychiatry in Medicine, ch. 13, pp. 166-167 (1978).
[4] The testimony of Dr. Moan.
[5] See generally Cecil, Textbook of Medicine, 15th ed., vol. 1, pp. 82-84 (1979). On page 83 it is stated: "... Repeated episodes of mild acute poisoning can occur without cumulative effects.... In mild cases clearance of carbon monoxide from the blood is spontaneously accomplished if respiration is sustained. Fresh air and absolute rest are sufficient in such cases; ..."